Jasper NEELY, et al.,
Plaintiffs-Appellants,

v.

CITY OF GRENADA, et al.,
Defendants-Appellees.

No. 85–4510.

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1986.

John L. Walker, Nausead L. Stewart, Jackson, Miss., for plaintiffs-appellants.

Henry T. Arrington, New Orleans, La., for defendants-appellees.

Before GARWOOD and HILL, Circuit Judges, and WILL *, Senior District Judge.

ROBERT MADDEN HILL, Circuit Judge:

This appeal is the class plaintiffs' challenge to a district court's refusal to hold the defendants in contempt of a broad remedial order in a racial discrimination suit. The plaintiffs also contend that the district court should have modified this order in specified ways. We hold that the district court did not abuse its discretion in either respect, and nor do we find that the district court erred in finally ending its jurisdiction over this twelve-year-old class action. Accordingly, we affirm in all respects.

## I. PROCEDURAL HISTORY

### A. Litigation of Liability

In January 1974 Jasper Neely and two other named plaintiffs filed a class action alleging widespread racial discrimination in the city of Grenada, Mississippi ("Grenada"), on behalf of themselves and a class defined as "all past, present, and future Black employees ... of the Grenada, Mississippi Police Department, Fire Department, Water Department, Sanitation Department and City Offices." Named as defendants were the city of Grenada, its police, fire, water, and sanitation departments, its mayor, city manager, members of its city council, and its police and fire chiefs. The complaint alleged that the defendants had for many years failed to hire or promote class members because of their race, resulting in a nearly all-white city government work force, with the few blacks occupying menial positions. The plaintiffs alleged theories of relief pursuant to civil rights statutes, 42 U.S.C. §§ 1981, 1983, Title VII, 42 U.S.C. § 2000e–5(f)(g), and declaratory judgment provisions, 28 U.S.C. §§ 2201, 2202.

The district judge assigned to the case was to preside over the next eleven and one-half years of its litigation. The district court upon motion ruled the suit "maintainable as a class action" in October 1974.[1] Extensive discovery, including depositions of numerous class members and city officials, was conducted with frequent intervention required of the district court. An amended complaint in October 1974 added several more past and present city officials as defendants. After several delays and

* District Judge of the Northern District of Illinois, sitting by designation.

1. The district court certified the class as one on behalf of "all Black residents of Grenada County, Mississippi, who have applied or may in the future apply for employment in any of the departments of the City of Grenada, and all Blacks presently employed by the city in any of its departments."

last-minute discovery wranglings, the district court held a seven-day bench trial in December 1976 on issues of liability. The court in April 1977 issued a preliminary injunction barring the defendants from hiring any non-laborer or non-janitorial employees without prior court approval. Over the following months, the district court became involved in the details of Grenada's hiring practices, approving the hiring of each new employee and modifying the preliminary injunction to exempt certain part-time positions.

In August 1977, the district court released a lengthy memorandum opinion delineating its findings of fact and conclusions of law as to the individual and class claims. 438 F.Supp. 390 (N.D.Miss.1977). The opinion explained in detail the long-standing underrepresentation and underemployment of blacks in the city work force as a whole as well as in the various city departments. The court described several instances where willing and qualified blacks were passed over in hiring or promotion in favor of equally or less well qualified whites. The court found the city and its officials liable under civil rights statutes and Title VII, and permanently enjoined the "practicing [of] racially discriminatory policies" in the hiring, promotion, and training of city employees. The court ordered the parties to propose appropriate affirmative action programs to remedy the continuing discrimination, and ordered that the class be notified in order to identify injured members who were entitled to back pay. No appeal was taken from these determinations.

Several class members filed individual claims for back pay, and the plaintiffs filed a proposed affirmative action plan. The court referred these claims for back pay to a magistrate appointed as special master. Ultimately, the parties entered into a stipulation on the amounts of back pay due to several individuals, in amounts ranging from a few hundred to several thousand dollars each. Shortly thereafter, the district court awarded attorney's fees to the two attorneys who had successfully represented the plaintiff class.[2]

### B. The Affirmative Action Plan

On November 1, 1977, the district court issued a judgment containing a plan of sweeping injunctive relief for the plaintiff class (hereinafter also referred to as "the affirmative action plan" or "the plan"). The plan was predicated on the findings of racial discrimination described in the August memorandum, and was adopted "in order to overcome the effects of past discrimination and to adopt objective, racially nondiscriminatory standards for the City's hiring, training and promotion of its employees." The plan was a comprehensive program of affirmative action to assist black applicants and employees by specifying procedures and policies relating to hiring, training, promotions and transfers, and employee grievance resolution.

The plan contemplated that hiring be done in certain specified ways. A personnel consultant was to develop job descriptions and written training and evaluation procedures. The defendants were required to notify all blacks who had applied for jobs since 1968 that they had an opportunity to reapply. Written application forms were required, the recruiting of qualified blacks was encouraged, and all notices of position vacancies were to be posted. Most concretely, the plan required that "subject to the availability of qualified black applicants, the City officials shall fill all entry positions on the basis of two blacks to be hired for every three whites in each department until such time as a ratio of black to white employees in such department shall approximate 36%, which corresponds to the percentage of the black working age (16–65) population in Grenada County, Mississippi."

2. The district court used locally customary fees of $45 and $35 as the maximum compensable hourly rate. *See* 77 F.R.D. 484, 486 (N.D.Miss. 1978). The plaintiffs successfully appealed this rate as inadequate, and this court found that $100 per hour was reasonable. *See* 624 F.2d 547, 551 (5th Cir.1980). Shortly thereafter the parties stipulated to increased attorney's fees.

The plan foresaw new and more formalized training procedures. A training officer was to oversee the training of new employees in each department and agency according to a written training program. The plan required the city to send equal numbers of black and white employees to training sessions at outside institutions, and to alternate blacks and whites if only one employee at a time could attend. The black employees in the water and sanitation departments, who were historically limited to menial positions, were to receive certain special training to improve their opportunities for promotion.

Promotions and transfers were also affected by the plan. Promotions were to be made on the basis of the objective and nondiscriminatory qualifications listed in each job description. The plan also set goals for promotions. "[S]ubject to the availability of qualified black incumbent employees, future promotions for the next two vacancies in each department shall be filled by qualified blacks who meet the prescribed job criteria." Thereafter, promotions were to be made without regard to race. Transfers between departments were permitted where no qualified incumbent department employees were available. Openings were to be posted at the office of the city clerk and the various departments, and if these notices were not effective, then to be published in the local newspapers.

A detailed grievance procedure was mandated to assist the implementation of the plan. Disputes concerning the terms or conditions of employment, including claims of discrimination, were to be resolved by the aggrieved employee presenting her complaint in turn to her supervisor, her department head, the city manager, and ultimately the city council before resort to the Equal Employment Opportunity Commission ("EEOC"). At each level of the grievance procedure, strict time limits required the decisionmaker within the specified time to either answer the grievance (from which the employee could appeal) or permit the employee to appeal to the next level. Whenever a grievance was decided

in favor of the employee, the award was to be retroactive, and any persons responsible for racially discriminatory practices were to be subject to disciplinary action.

Finally, the plan required that copies of the plan be published in pamphlet form and distributed to employees, applicants for employment, and interested citizens. The city was required to "post on the bulletin board of each municipal department and agency a notice of its racially nondiscriminatory employment practices and opportunities for training and promotion as herein directed." The defendants were required to file semiannual reports until June 1981 concerning hiring, current employment, promotions, transfers, and training. The district court expressly retained jurisdiction to enforce, supplement, or clarify the terms of the plan. No appeal was taken from this judgment.

### C. Compliance Proceedings

Shortly after the promulgation of the affirmative action plan, compliance began. The defendants quickly moved for approval of the employment of a personnel consultant. While prior back pay and attorney's fee issues were being resolved, the defendants filed the required semiannual reports. The parties contested the proper method for the city to finance its payment of back pay and other amounts as well as the termination of a black police officer. Proposed revisions in the personnel policies of the fire and police departments were opposed by the plaintiffs, but the district court approved policies which included the grievance procedures contemplated by the plan. The district court also approved job descriptions and other rules and regulations proposed by the defendants.

In December 1981 the plaintiffs, dissatisfied with the city's progress in complying with the plan, filed a motion to hold the defendants in contempt of the November 1, 1977, judgment and to request additional relief. The plaintiffs requested, *inter alia,* that the defendants be held in contempt for violating the terms of the plan with respect to the hiring, promotion, and training of

class members. The motion also requested a revision in various specified ways of the grievance procedure set out in the plan.

After more disputes on collateral issues [3] and extensive discovery and pretrial conferences on the contempt motion, a four-day evidentiary hearing was held in April 1984. The plaintiffs called twenty-nine witnesses, five of which were adverse. Testimony centered largely on individual instances of the defendants' perceived failure to hire, train, promote, and transfer class members in accordance with the plan, and alleged failings in the grievance procedure as implemented. Some class members also testified concerning the alleged failure of the city to post all job vacancy notices as well as instances of racial harassment and other forms of discrimination. After the hearing, each side filed proposed findings of fact and conclusions of law.

The district court on June 12, 1985, signed an order denying the plaintiffs' motion for contempt and their request for modification of the plan's grievance procedure. The court also approved the revised personnel policies and regulations previously filed by the defendants and denied the plaintiffs' request for attorney's fees. The court dissolved all prior injunctive orders and ordered the case closed for all purposes. Attached to the order was a lengthy memorandum drawn largely from the defendants' proposed findings of fact and conclusions of law. The court on June 26 denied the plaintiffs' motions for new trial and to alter and amend the judgment. The plaintiffs appeal the orders of June 12 and 26.

## II. ISSUES ON APPEAL

### A. Civil Contempt

The plaintiffs concede that the district court applied the correct burden of proof to their claim that the defendants were in contempt of the judgment constituting the affirmative action plan. "In a civil contempt action the proof of the defendant's contempt must be 'clear and convincing,' a higher standard than the 'preponderance of the evidence' standard, common in civil cases, although not so high as 'beyond a reasonable doubt.' " *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir.1976) (citations omitted); *see also Northside Realty Associates, Inc. v. United States*, 605 F.2d 1348, 1353 (5th Cir.1979). The district court expressly held that the plaintiffs' evidence failed to meet this "clear and convincing" standard.

■ We review a refusal to hold a party in civil contempt with the "abuse of discretion" standard. *See, e.g., Vertex Distributing, Inc. v. Falcon Form Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir.1982); *Washington-Baltimore Newspaper Guild v. Washington Post Co.*, 626 F.2d 1029, 1031 (D.C.Cir.1980).[4] As to subsidiary findings

---

**3.** For example, the plaintiffs moved to enjoin the city's impending contract with Waste Management, Inc., a firm which would allegedly have undertaken the function of the sanitation department, thereby laying off several black employees in the department. The district court granted partial relief, ordering that nine such employees be offered jobs in other city departments.

**4.** We are troubled by almost verbatim adoption of the defendants' proposed findings of fact. This circuit has long disapproved the uncritical acceptance of proposed findings. *See, e.g., Railex Corp. v. Speed Check Co.*, 457 F.2d 1040, 1042 (5th Cir.), *cert. denied*, 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972). However, such a practice does not by itself require reversal. *See id.* Moreover, the standard of review of such findings remains the same. *See id.* While the district judge must have been completely persuaded by the defendants' view of the evidence, his prior orders indicated he had a deep understanding of the case. *Cf. Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.) ("While the 'clearly erroneous, rule ... applies ... we can take into account district court's lack of personal attention to factual findings...."), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). We cannot ignore the extensive relief granted the plaintiffs by the district court prior to these contempt proceedings. The court's findings in this context have the quality of reflection rather than reflex. The detailed factual findings of discrimination made in August 1977, as well as the court's long and concerned involvement with the case, demonstrate that the district court was well aware of the background and personalities involved. Thus, in this instance the district court's adoption of the defendants' suggested

of fact, we apply the normal "clearly erroneous" standard. *See* Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed.2d 746 (1948); *see also Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

The plaintiffs' motion alleged that the defendants had violated the terms of the affirmative action plan.[5] Broadly construing the contentions of their brief, we organize the plaintiffs' allegations according to the provisions of the plan. We thus examine allegations concerning violations of the hiring, training, and promotions and transfers provisions.[6]

### 1. Hiring

The district court found that Grenada had succeeded in meeting the hiring provisions of the plan. The court found that the city had formulated job descriptions, notified prior applicants of their right to reapply, and required written application forms from all applicants. According to the district court, notices of all vacancies in entry level positions were posted in city hall and in all departments of the city. The court found that the city had complied with the

ordered hiring goals, since Grenada had met or exceeded the thirty-six percent minority ratio for all entry level jobs.

The plaintiffs largely conceded these findings except in one aspect. It went undisputed that the defendants met the numerical hiring ratios, and that personnel policies and job descriptions were in use. The plaintiffs have not identified any evidence in the record which indicated that prior applicants were not notified or that application forms were not used. However, the plaintiffs presented some testimony that job vacancies were not properly posted.

We perceive no abuse of discretion in the district court's failure to find the defendants in contempt as to their hiring efforts. The evidence established a regularization of the hiring process, and the defendants produced concrete results by integrating all of the city departments. As for the posting of vacancies, the plaintiffs admit that the testimony was at best "contradictory." The city's administrative secretary testified that she had typed all the notices of job vacancies, posted them at the city hall, and forwarded copies to the department heads for posting at the city departments. Although one witness, a class member, testified that no vacancies were posted until 1980, this factual conflict was one in the first instance for the district court.[7] The plaintiffs admit that "some

---

findings of fact gives us less concern than such practice otherwise would.

**5.** The district court properly found that the contempt motion alleged only noncompliance with the plan, rather than noncompliance with previous orders. The hearing was held to determine compliance with the plan, not with all of the orders rendered throughout this litigation. Although the plaintiffs suggest otherwise, they concede at one point in their brief that "[o]n December 29, 1981 plaintiffs again filed a motion to hold defendants in contempt of the November 1, 1977 order [the plan]...."

**6.** The record amply supports the conclusion of the district court that the defendants did not violate the terms of the grievance procedures, and the plaintiffs press no specific claims of grievance violations here except that the plan (and the grievance procedures) were not published. Instead, they contend that the district court erred in failing to modify the plan's griev-

ance procedures. We discuss this contention in Part II B *infra*.

**7.** The only specific example given by the plaintiffs of a vacancy being filled before its posting was that of detective sergeant. However, the evidence indicated that these were not vacancies as such but newly created positions used to increase the pay of two officers. Of the two officers who filled these positions, one was white and the other black.

The plaintiffs also contend that the position of police chief was not posted when it became vacant. However, the portion of the record cited does not support this contention. Moreover, the district court determined that department head vacancies were exempted from the normal requirements.

jobs may have been posted in 1979." We find no clear error in the court's resolution of this lone subsidiary factual issue.

## 2. Training

The district court's findings on compliance with the plan's training provisions can be summarized as follows. There was no evidence of noncompliance other than in regard to the police and fire departments. Training officers were designated at all city departments. All new police officers were given on-the-job training, were assigned to ride with experienced officers, and were sent to the state police academy. There was no evidence that any black police officers were denied training opportunities open to white police officers. All new firefighters were encouraged to attend the fire academy, and no black firefighters were denied opportunities to attend that whites were allowed. Continual on-the-job training was conducted for all firefighters.

The plaintiffs' complaints as to training deficiencies pertain only to the police and fire departments. As for the police department, the plaintiffs contend that the evidence showed the department training program to be unstructured and haphazard. The evidence showed that no permanent training officer was named. The plaintiffs contend that there was no formula for evaluating the program, and that written policy guidelines were not developed. Class members testified that on the-job training was brief and inadequate, or nonexistent.

■ However, we cannot conclude that the district court abused its discretion in failing to find the defendants' efforts to train police officers to constitute contempt. Although somewhat lacking in formality, this training program did not violate the express terms of the affirmative action plan in any significant respect. The plaintiffs concede that black and white police officers alike were offered formal training at the state police academy. The police

chief testified that each new police officer received on-the-job training and rode for a few days with an experienced officer in a patrol car. Some class members substantially corroborated the chief's account, testifying that they received such training. Class members also testified that they had attended advanced courses at the academy as well as the basic training session. Evidence of differences in on-the-job training given to black and white officers was fragmentary; other testimony indicated that such internal training for whites was at least as informal and unstructured as that given to blacks.[8] Conflicts in the testimony regarding the extent or nature of police training were properly resolved by the court, and we find no clear error. The lone undisputed failure of the defendants, that of their failure to reduce their training program to writing, does not appear significant enough to persuade us that the district court abused its discretion in not making a finding of contempt.

The plaintiffs concede that most of the inadequacies of the city training programs originated not with the police but with the fire department. According to the plaintiffs, most black firefighters have not been allowed to attend the state fire academy, which offered courses required for state certification. Although two certified training officers were designated to conduct internal and on-the-job training, the plaintiffs contend that such training was inconsistent and irregular. Overall, the plaintiffs argue that the training program in the fire department was unstructured and subject to favoritism.

■ We have no definite and firm conviction that the district court erred in resolving the factual disputes at the heart of these complaints, for other evidence strongly supported the court's conclusions. The fire chief testified that he encouraged all firefighters to attend the state academy, and that he had never denied any firefight-

---

**8.** For example, a black police dispatcher claimed that her on-the-job training was very brief, consisting of a police officer showing her how to operate a radio and use the department codes. She was instructed in turn to give brief training to two new dispatchers, both white. She then attended a school for dispatch training at city expense.

er the opportunity to attend an outside institution. As for the testimony of black firefighters who alleged that they were discriminatorily denied the opportunity to attend outside institutions, the record is also open to the interpretation given by the district court, that legitimate reasons existed for their nonattendance. Of the several such witnesses, one could not attend for failure to pass the necessary physical exam, another had refused to attend several outside training sessions while waiting to attend the state academy (which he was currently scheduled to do at the time of the April 1984 evidentiary hearing), a third testified that he had never attended the state academy but did not mention whether he had ever applied, and others began the state academy training but did not complete the course. The fire chief contradicted the testimony of the plaintiffs who criticized the internal training, stating that daily sessions were conducted on the use of equipment and knowledge of the city streets and hydrant locations. We find no merit to plaintiffs' contention that the district court abused its discretion in failing to make a finding of contempt.

### 3. Promotions and Transfers

The district court concluded that the defendants complied with the provisions of the plan regarding promotions and transfers. The court determined that the first two promotions in the street, water, and fire departments went to black employees. The first vacancy in the police department went to a white employee, and the district court found that the competing black employee, Denise Bell, was not qualified. The next three vacancies in the police department were filled in one day, when two blacks and one white were promoted. The

court found that the city had thereafter followed the required procedures for promotions and transfers, looking first to qualified employees within the same department, then turning to other departments, and finally to public advertising.

The plaintiffs for the most part concede that the defendants complied with the plan's requirement that the first two promotions in each department go to blacks.[9] However, they contend that the defendants later violated the terms of the plan in two other ways. First, they contend that objective, non-discriminatory criteria for promotions were not developed. Second, they argue that the second stage of race-neutral promotion and transfer requirements were not met, alleging here as below that several black employees were denied the opportunity for advancement while vacancies were filled by whites.

We find no merit in the plaintiffs' contentions. The district court properly concluded that the proper procedures for filling vacancies were complied with. Our review of the record indicates that of the several class members who testified on the subject of promotions, the majority of the plaintiffs' witnesses who had requested promotions received every one requested. A few other class witnesses testified that they had been denied a promotion but had received one or more promotions later, and only four class members testified that they had received no promotions. Of these four, all had either resigned before a promotion could be received, possessed a poor work record, or were denied promotions that were given to other class members. We therefore find no support for the plaintiffs' sweeping claims of the defendants' contempt.[10]

---

9. The plaintiffs contend that Denise Bell was qualified but not promoted. However, sufficient evidence was presented for the district court to properly conclude as it did. The police chief testified to her violent temper and her history of disciplinary infractions. A trial exhibit listed the reasons for her failure to be promoted as poor performance and an adverse disciplinary record.

10. The plaintiffs also maintain that the district court erred in not holding the defendants in contempt for their alleged failure to distribute pamphlets containing the entire plan to all employees and applicants. A copy of the plan was posted on all city bulletin boards, but there was no evidence that pamphlets were published containing the entire plan. Instead, the record indicates that the city distributed handbooks which contained the grievance procedure but

## B. Refusal to Modify

The plaintiffs also urge us to reverse the district court's refusal to modify the grievance procedures outlined in the plan. The failure to modify injunctive relief is ordinarily reviewed under an abuse of discretion standard. *See System Federation No. 91 v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961). However, in a "sufficiently compelling case" an appellate court can conclude that a district court erred in refusing to modify. *See Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). A district court "should" modify a decree if the prescribed relief has not put an end to the illegal conduct. *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 252, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968) (district court has power to modify a decree even absent "clear showing of grievous wrong evoked by new and unforeseen conditions").

The plaintiffs' December 1981 motion requested modification as follows: (1) allowing the filing of group grievances; (2) tolling the period within which to make a grievance until an employee has knowledge of an act complained of; (3) entry of an adverse decision to the city upon its failure to comply with time limits; (4) extending the time for filing grievances; and (5) prohibiting the city from retaining counsel to defend grievances. Several of the witnesses testified to their views of problems with the grievance procedures. However, we cannot conclude that the district court abused its broad discretion in failing to fashion new relief.

The plaintiffs' case for these modifications is far from a compelling one. The plaintiffs complain, without elaboration, that certain unspecified grievances, such as "nepotism, cronyism, and favoritism" could not be individualized and required group consideration. While some grievances were dismissed because untimely, the plaintiffs do not indicate whether the untimeliness was due to the employee's unawareness of the acts complained of. Although employees experienced delays in the processing of their grievances, the plan specified that an employee could take his grievance to the next higher level of the city hierarchy if he did not receive a response within the specified time. Although the plan did not provide sanctions if the city council did not act on the appeal of a grievance within the specified ten days, the plaintiffs have not indicated how any employee suffered prejudice. Finally, the plaintiffs do not establish the wisdom of prohibiting the city council from receiving legal advice pertaining to grievances. In sum, it is difficult to interpret the plaintiffs' flat statement that "the city's grievance procedure was problematic for class grievants in that there were due process violations of fairness and impartiality."

The district court noted that some employees who filed grievances had received relief from city officials without resort to further action. Of the grievances taken through the chain of city officials without satisfaction and then presented to the EEOC, all but one were either dismissed or issued a "no-cause determination." This final one was settled.[11] Some employees felt that "it would not have done any good" to file a grievance, and thus they either never filed grievances or dropped them during the process. We find no abuse of the district court's discretion.[12]

---

not the other elements of the plan. Thus, although not distributed to every employee, the plan was at least available to every interested city worker, and every employee was given the procedure for challenging city action. We find no abuse of discretion.

11. The district court evidently noted these EEOC determinations not, as plaintiffs suggest, to indicate whether separate suits could be brought, but rather to acknowledge that a deci-

sionmaker independent of city officials had come to similar conclusions about many of the grievances.

12. The plaintiffs' citation of *Meritor Savings Bank v. Vinson*, — U.S. —, ——, 106 S.Ct. 2399, 2409–11, 91 L.Ed.2d 49 (1986) does not convince us to the contrary. *Meritor* holds only that a Title VII defendant is not shielded from liability by virtue of the plaintiff's failure to exercise an existing grievance procedure, at

## C. Release of Jurisdiction

Lastly, the plaintiffs appeal the district court's release of its jurisdiction over the class action. The court stated that "no useful purpose would be served by retaining jurisdiction of this cause. Such complaints as may arise should be pursued by individuals having grievances against the city's employment policies and practices by presenting same to the City Council, the Equal Employment Opportunity Commission and, of course, in a federal court of competent jurisdiction." The district court thereupon dissolved all prior injunctive orders issued against the defendants and ordered the case closed for all purposes. The plaintiffs contend first that this dismissal was on the court's own motion, and thus premature, and second that individual instances of racial discrimination continue to occur.

The plaintiffs' claim that the dismissal of the class action was rendered without notice or hearing is not well taken. *Cf. United States v. Texas*, 509 F.2d 192, 194 (5th Cir.1975) (sua sponte dismissal of school desegregation case improper without notice, hearing, and completion of defendants' compliance reporting obligations). Shortly after the plaintiffs filed their contempt motion in December 1981, the defendants responded with a motion which requested in part the "dissolution" of the plan and indicated their desire to be released from the district court's jurisdiction. The hearing held in April 1984 was partially for the purpose of taking evidence on this request. If, as actually transpired, the district court were to find the defendants in compliance with the plan, it could not have been a surprise to the plaintiffs that the district court would consider ending the class action. The plaintiffs' reply brief has now conceded that the defendants did indeed file a motion to be relieved of the court's jurisdiction.

■ Turning to the plaintiffs' second contention, we conclude that the district court committed no reversible error in dismissing the plaintiffs' class claims. As we have discussed above, the district court properly found that its order had been complied with and that no further class-wide relief was warranted. The defendants met the court-imposed hiring and promotion goals, implemented the detailed grievance procedures, reported to the court on their compliance, and otherwise satisfied the strictures of the court's decree. No new class-wide claims of discrimination were presented. The record demonstrates that the defendants have eliminated the city-wide effects of the prior racial discrimination practiced by the Grenada officials. *Cf. United States v. Texas Education Agency*, 647 F.2d 504, 508 (5th Cir.1981) (school desegregation), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). We see no necessity for the district court to retain jurisdiction over the class claims.

However, our holding in this instance is linked in large part to the district court's express allowance of individual actions arising from the same circumstances relevant to the class claims. While the district court concluded that the class action was no longer the appropriate vehicle for litigation of the remaining claims of discrimination, it explicitly permitted such individual actions to be brought.[13] Nothing in our

---

least where that procedure requires her to complain first to the supervisor who allegedly sexually harassed her. *See id.* The defendants here do not claim that the existence of a grievance procedure necessarily insulates them from all liability for racial discrimination; they contend only that the procedure worked well enough to justify its continuance as one means of dispute resolution.

13. The plaintiffs have pressed several new claims of racial discrimination which admittedly do not constitute violations of the express terms of the district court's orders in question. The district court properly excluded some evidence of these new claims from the contempt hearings. However, these new claims, which include charges of racial harassment, maintenance of dual fire stations (segregated by race), and other forms of racial discrimination, are troubling, and may deserve resolution in future actions.

One such claim deserves special mention. Plaintiffs contend that the defendants failed to meet the burden of showing that a high school diploma requirement for hiring or promotion

opinion should be read to impose any necessary barrier to the success of these future individual actions.[14]

Accordingly, we affirm the final order of the district court in all respects.

AFFIRMED.

was employment related. However, even if this were an original Title VII proceeding and not a contempt hearing, such a burden arises only after "the complaining party or class ... has shown promotion in a racial pattern significantly different from the pool of applicants." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). Although plaintiffs contend that some blacks were denied promotion because of the high school diploma requirement, they do not indicate whether this requirement screened out blacks in disproportionate numbers. Thus, the burden would not shift to defendants. *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), is not to the contrary. An employment test which has a disparate impact on racial minorities cannot be upheld merely because minorities ended up being promoted at levels reflecting applicant pools. *Id.* However, the disparate impact threshold remains. Plaintiffs have not shown that black applicants for promotion in this instance are less likely to have a high school diploma than white applicants. We express no opinion as to the final result of this claim, should it ever be litigated in a future action.

14. We note that the district court granted individual monetary relief in the form of stipulated back pay for claims prior to the January 18, 1978 stipulation. Subsequent individual claims have not been barred by any action of the district court or this court in resolution of the class claims. Moreover, the procedural posture of the action now on appeal requires different treatment of new underlying individual claims. The plaintiff's burden to show the defendants' contempt by clear and convincing proof, in contrast to the normal burden and order of proof in a race discrimination suit, *see, e.g. McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), means that no issue preclusive effect could occur. The district court's order expressly negates any claim preclusive effect. We further recognize that, as a general rule, a statute of limitations for an individual claim is tolled during the pendency of a class action containing the same claim. *See, e.g., Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).