**Dennis E. WHITFIELD, Deputy Secretary of United States Department of Labor, Plaintiff-Appellant,**

v.

**Roland R. PENNINGTON, Jr., et al., Defendants-Appellees.**

No. 87–2140.

United States Court of Appeals,
Fifth Circuit.

Nov. 25, 1987.

Rehearing Denied Dec. 30, 1987.

Karen L. Handorf, U.S. Dept. of Labor, Plan Benefits Sec. Div., Washington, D.C., for plaintiff-appellant.

Gerald T. Holtzman, Christina Richard, Holtzman & Urquhart, Houston, Tex., for Pennington & Donnell.

Before CLARK, Chief Judge, RANDALL and DAVIS, Circuit Judges.

RANDALL, Circuit Judge:

The Secretary of the United States Department of Labor appeals from the district court's denial of the Secretary's motion to reconsider or vacate the district court's earlier decision refusing to hold Roland R. Pennington, Jr. and James M. Donnell in civil contempt for refusing to make specified payments due under a consent order. As we find that the district court abused its discretion by failing to hold Pennington and Donnell in civil contempt, we reverse.

I.

A. *The Consent Order*

The instant appeal arises from proceedings initiated by the Secretary of the Unit-

ed States Department of Labor ("the Secretary")[1] seeking civil contempt sanctions against Roland R. Pennington, Jr. ("Pennington") and James M. Donnell ("Donnell") for their failure to make certain payments required by a consent order.[2] In 1979, the Secretary began an investigation of the Retirement Plan for Employees of Control Specialties, Inc. ("the Plan")[3] pursuant to section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Pennington is the Chairman of the Board and the holder of all the voting stock in Control Specialties, Inc. ("CSI"). Pennington and Donnell served as trustees of the Plan.[4] The investigation was completed by the end of July, 1984. On September 7, 1984, the Secretary informed Pennington and Donnell of the findings of the investigation and offered them an opportunity to resolve the problems the investigation uncovered by agreeing to a consent decree. After months of negotiation, a complaint was filed with the United States District Court for the Southern District of Texas[5] and, on the same day, a proposed order and final judgment ("consent order"), signed by counsel for both parties, was submitted to the district court.

The complaint alleged that the trustees of the Plan had violated a number of the fiduciary and prohibited transaction provisions of ERISA. The relief sought included correction of the prohibited transactions and restitution to the Plan for losses incurred as a result of the trustees' alleged breaches of fiduciary duty. The consent order was submitted to the district court on April 17, 1985 and was entered on August 29, 1985. Among other things, the consent order required Pennington to purchase all common stock of the J.E. Lonergan Company, a former acquisition target of his, from the Plan for $301,616.02. Payment was to be made in three equal installments of $100,538.67 with payments due on June 1, 1985, March 1, 1986, and March 1, 1987. Moreover, Pennington and Donnell were jointly required to make restitution to the Plan in the amount of $140,000 with $46,667 due as an initial payment on June 1, 1985 and payments of $55,224.96 due on June 1, 1986 and June 1, 1987.

## B. The Offset of CSI's Account

On February 15, 1983, the Plan obtained a $500,000 loan from BancTexas-Houston ("the Bank") for the purpose of investing in long term residential mortgages.[6] On

1. In this opinion, we will use "the Secretary" to mean both the Secretary and the Department of Labor.

2. The parties in this case both submitted stipulations of facts to the district court prior to its hearing on the Secretary's motion to find Pennington and Donnell in contempt. While the parties neglected to enter the stipulations into the record at the hearing, that oversight was corrected by a "Joint Motion for an Order admitting into evidence, nunc pro tunc," the stipulations. On February 25, 1987, the district court granted the motion. Pennington and Donnell filed an unopposed motion to supplement the record by including the stipulations with this court on April 14, 1987, and we granted their motion. As did the district court, we rely on these stipulations.

3. The Plan was established in 1978 as an employee benefit plan as contemplated by section 3(3) of ERISA, 29 U.S.C. § 1002(3). Two other employee benefit plans, the Profit Sharing Plan for Employees of Control Specialties, Inc. and the Profit Sharing Plan for Employees of Elliot Valve Repair Company, a Division of Control Specialties, Inc., were merged with the Plan effective November 1, 1980 and March 1, 1981

respectively. The Plan is funded entirely through contributions from Control Specialties, Inc. ("CSI") as the Plan's sponsor. Benefits eventually provided to Plan participants are dependent on the amount of money contributed by CSI and any earnings the Plan may recover from the trustees' investment of these contributions. See 29 U.S.C. § 1002(34).

4. Other trustees of the Plan included Wesley E. Fox and James R. Rosier. They are not parties to this appeal.

5. The district court had jurisdiction over the underlying dispute by virtue of section 502(e) of ERISA, 29 U.S.C. § 1132(e).

6. The loan was included in the Secretary's investigation due to his determination that "the loan was imprudent to the extent that Pennington had caused the Plan to borrow the money at an interest rate then in the eighteen percent range in order to make mortgage loans (to various friends and acquaintances) at an interest rate of twelve percent." As a result, the consent order included a paragraph ordering Pennington to pay the Plan that portion of the interest pay-

the same day, a guaranty of contribution was executed in which CSI guaranteed to the Bank that it would make annual contributions to the Plan in an amount not less than $150,000 per year until the loan was repaid. This guaranty of contribution gave the Bank the right to offset any amounts owing on the loan against CSI accounts with the Bank in the event that CSI failed to make the required contributions.[7] The Plan, in turn, executed a negative pledge of its assets and agreed to apply any and all contributions from CSI toward payment of the loan. On March 9, 1983, CSI's board of directors resolved that CSI would contribute not less than $150,000 annually to the Plan until the loan obligation was discharged. On September 1, 1983, CSI contributed $150,000 to the Plan. This contribution was applied toward payment of the loan and, when combined with earlier payments by the Plan, resulted in a reduction in the principal balance to $300,000. By late 1985, the loan had been renewed twice and the principal had been reduced to $260,000. CSI failed to make its $150,000 contributions to the Plan in 1984, 1985, and 1986.

On November 20, 1985, the Bank advised MBank-Houston ("MBank"), the Plan's independent fiduciary,[8] that the Bank was amenable to allowing the note to remain past due until December 1, 1985. On December 15, 1985, MBank received $138,-869.01 from a third party from the purchase of real estate owned by the Plan and made a $100,000 payment on the loan. After the payment was allocated between interest and principal, the principal balance stood at $174,953.61. Because CSI had failed to make the annual $150,000 contributions that it had guaranteed would be made to the Plan, the Bank exercised its option under the guaranty of contribution and offset CSI's corporate account in the amount of $179,580.49 on January 29, 1986.

On February 7, 1986, Pennington's counsel met with MBank representatives regarding the offset and agreed that on March 1, 1986, the required date of a payment under the consent order, Pennington would be credited for the offset and would be refunded the difference between the amount due under the consent order and the amount of the offset. The agreement envisioned a $179,932.51 payment from MBank to CSI followed by a $101,390.22 payment to the Plan by Pennington. The Secretary determined that the Plan did not in fact owe CSI any money and disallowed the transaction.[9] On March 28, 1986, the

ment on the loan that exceeded twelve percent. As the Secretary noted, at the time the investigation of the Plan was completed in late July of 1984, the Plan's payment on the loan was current and CSI had not yet defaulted in its obligation to contribute money to the Plan. Accordingly, no further breaches of fiduciary duty were alleged with respect to the loan, and restitution for the interest differential remained the sole remedial provision in the consent order.

7. The guaranty of contribution provided:

WHEREAS, BancTexas Houston ("Bank") has lent the sum of $500,000.00 to the Retirement Trust for Employees of Control Specialties, Inc. ("Trust") as evidenced by that certain Promissory Note dated February 15, 1983, in the amount of $500,000.00 ("Note"), the undersigned Control Specialties, Inc. ("Company"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby guarantee unto Bank that Company will contribute, or cause to be contributed, to the Trust annually during the term of the Note, an amount equal to not less than $150,000.00 per year, with the understanding that any and all such sums contributed, but in no event less than $150,-

000.00 per year, shall be applied in reduction of the Note.

Upon the breach by Company of this Guaranty, Bank may, without notice of any kind, any and all such notices being hereby expressly waived, take such action as is available at law or in equity, including, without limitation, offsetting any amounts owing hereunder against any property of Company held on deposit in or by Bank.

8. The consent order filed by the parties specified the selection of an independent fiduciary to administer the Plan's assets. On September 18, 1985, the district court appointed MBank as the independent fiduciary.

9. On March 26, 1986, the Secretary wrote a letter to Marshall J. Shanklin, the MBank representative in charge of the Plan's account, outlining the Secretary's objections to the proposed arrangement. Aside from outlining a number of perceived ERISA violations in the transaction, the Secretary wrote:

Moreover, it is our view, based upon the documents, that the Plan owes CSI no money. The Guaranty of Contribution provided that

Secretary advised Pennington's counsel that he considered all of the 1986 payment as unpaid and made formal demand for payment.[10]

## C. The District Court's Decision

On June 18, 1986, the Secretary applied to the district court "for an Order directing Roland R. Pennington, Jr. and James M. Donnell to appear and show cause why they should not be held in civil contempt of the [consent order]." [11] The district court ordered a hearing which was held on October 17, 1986. The Secretary's motion was denied at the close of the hearing. The district court did not issue an opinion nor did it specify its reasons for refusing to find Pennington and Donnell in civil contempt. Apparently, however, the district court concluded that the offset of CSI's corporate account by the Bank fulfilled Pennington's and Donnell's obligations under the consent order. On October 27, 1986, the Secretary timely filed a motion to reconsider or vacate the judgment under Federal Rule of Civil Procedure 59. This motion was denied without opinion by the district court on December 11, 1986 and notice of appeal from that decision was timely filed with this court on February 5, 1987.

The sole issue on appeal is whether the district court abused its discretion when it refused to hold Pennington and Donnell in civil contempt by apparently concluding that their personal obligations to make restitution to the Plan had been satisfied by the Bank's offset of CSI's corporate account.

## II.

A consent order, while founded on the agreement of the parties, is nevertheless a judicial act, enforceable by sanctions including a citation for contempt. *United States v. City of Miami*, 664 F.2d 435, 439–40 (Former 5th Cir. Dec. 1981) (en banc). A party may be held in contempt if he violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order. *Sec. and Exch. Comm'n v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. Oct. 1981). The civil contempt sanction is coercive rather than punitive and is intended to force a recalcitrant party to comply with a command of the court. *American Trucking Ass'n, Inc. v. Interstate Commerce Comm'n*, 728 F.2d 254, 255 (Former 5th Cir.), *cert. denied*, 469 U.S. 930, 105 S.Ct. 324, 83 L.Ed.2d 261 (1984); *see also Thyssen, Inc. v. S/S Chuen On*, 693 F.2d 1171, 1173–74 (5th Cir.1982). Intent is not an issue in civil contempt proceedings; rather, the question is whether the alleged contemnors have complied with the court's order. *Jim Walter Resources v. Int'l Union, United Mine Workers of America*, 609 F.2d 165, 168 (5th Cir.1980). In a civil contempt action, proof of contempt must be "clear and convincing." *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir.1976). We

CSI would contribute to the Plan "annually during the term of the note" $150,000.00 per year, with the understanding that the contribution would be applied toward reduction of the note. By letter dated March 11, 1983, the Plan, in turn, agreed to apply all sums received as contributions "including, without limitation, annual contributions of at least $150,000.00 contemplated to be made by Control Specialties, Inc." toward reduction of the note. For at least the last two years, CSI has not made the annual $150,000 contribution required to be made by the Guaranty of Contribution, but has only made three small contributions totalling $36,000 in 1985 as outlined above. Accordingly, CSI has fallen short in its required contributions to the Plan by at least $264,000. Since the amount owed on the note, $179,932.51, is far less than the amount CSI was required but failed to contribute to the Plan, it is, in our view, clear that the Plan owes CSI nothing.

**10.** The Secretary contends that Pennington failed to make the March 1, 1986 payment of $100,538.67 for the J.E. Lonergan stock and that Pennington and Donnel did not make the June 1, 1986 restitution payment of $55,224.96. In his petition for an order to show cause, the Secretary maintained that Pennington and Donnell had violated the consent order with respect to the June 1, 1985 payments as well. However, the Secretary has abandoned that claim on appeal.

**11.** The district court retained jurisdiction over the consent order in order to enforce its terms. 28 U.S.C. § 1345; Consent Order, Paragraph 14.

review a district court's refusal to hold a party in civil contempt under an "abuse of discretion" standard. *Neely v. City of Grenada*, 799 F.2d 203, 207 (5th Cir.1986).

■ The consent order clearly and unambiguously required Pennington and Donnell to make restitution to the Plan. Their obligation arose from their breaches of the fiduciary duty they owed to the Plan as trustees. They were charged with the responsibility of managing the Plan's assets. In carrying out that responsibility, they were found by the Secretary to have violated numerous provisions of ERISA. The settlement agreement, later embodied in the consent order, was designed to rectify these violations by putting the Plan in the position it would have been in absent the trustees' breaches of their fiduciary duty. *See Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Gilliam v. Edwards*, 492 F.Supp. 1255, 1266–67 (D.N.J.1980); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 644 n. 7 (W.D.Wis.1979).

The Secretary demonstrated to the district court, by undisputed evidence, a violation of the consent order. The record clearly reflects that Pennington did not make the $100,538.67 payment he was required to make to the Plan on March 1, 1986. Moreover, Pennington and Donnell did not make their joint payment of $55,-224.96 to the Plan on June 1, 1986. Once a violation was demonstrated, the burden then fell on Pennington and Donnell to show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the consent order. *Louisiana Educ. Ass'n v. Richland Par-*

*ish School Bd.*, 421 F.Supp. 973, 977 (W.D.La.1976), *aff'd* 585 F.2d 518 (5th Cir.1977); *see United States Steel Corp. v. United Mine Workers of America, Dist. 20*, 598 F.2d 363, 368 (5th Cir.1979). Pennington and Donnell failed to meet that burden. The Secretary demanded that the pair satisfy their financial obligations to the Plan. In response, Pennington and Donnell contended, and the district court apparently held, that they should be given credit for the CSI funds attached by the Bank. We cannot agree.

■ CSI was separately obligated to disburse funds to the Plan. CSI passed a corporate resolution through which it obligated itself to make yearly contributions of $150,000 to the Plan until the Bank's loan was repaid. CSI also executed a guaranty of contribution with the Bank reiterating its intention to fund the Plan and giving the Bank the right to offset funds if the envisioned contributions were not made. The Bank attached CSI's account pursuant to the guaranty of contribution when CSI failed to make payments to the Plan in 1984, 1985, and 1986 as it had bound itself to do. There is nothing in the record to indicate that the Bank offset the CSI account in order to ensure compliance with the terms of the consent order. Moreover, it is clear that the Bank would have had no authority to enforce the consent order even if it had wanted to do so. Neither the Bank nor CSI was a party to the consent order. The offset, therefore, could not be linked with Pennington's and Donnell's obligations to correct prohibited transactions and make restitution to the Plan. The offset was an entirely separate transaction which could have no effect on obligations flowing from the consent order.[12]

---

12. On appeal, Pennington and Donnell maintain that the Secretary, by characterizing the offset of CSI's account as the fulfillment of a separate legal obligation, was seeking to have the district court adjudicate the rights and obligations of entities not bound by the consent order (CSI and the Bank). Moreover, Pennington and Donnell urge that the district court could not have accepted the Secretary's position without interpreting the terms of the loan agreement and the guaranty of contribution. Finally, they argue that the Secretary was, in effect, asking

the district court to reform the terms of the consent order to effectuate an underlying, albeit unspecified, governmental purpose—a course the district court was powerless to embark on. *See United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (scope of consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties). We do not agree with this summary of the Secretary's position. Rather, we find that it was Pennington and Donnell who

Intimations to the effect that the Plan would suffer no loss if the offset was applied to Pennington's and Donnell's personal obligations were similarly misplaced. On appeal, Pennington and Donnell describe the money attached by the Bank as "Pennington's funds" in "Pennington's account." They argue that since the Plan had the use of "Pennington's funds" to satisfy a debt the Plan owed, they had complied with the mandates of the consent order. We find it misleading to characterize the CSI account as "Pennington's account." While Pennington may have had complete control over the CSI account by virtue of his position as sole shareholder and chairman of the board of the company, the account was not his personal account. The funds attached by the Bank pursuant to the guaranty of contribution were *CSI's*. While the distinction may be a subtle one, it is nevertheless a vital one. We are loathe to remove the veil of corporate identity as readily as Pennington might wish. The offset of CSI's account was a separate flow of funds into the Plan. If Pennington and Donnell had been compelled to make the restitution payments they owed, the offset would still have stood. In addition, the Plan might have a right of action against CSI for the balance of the contributions from 1984 through 1986. While we are in no position to judge the legal effect of the guaranty of contribution, neither was the district court. The district court, therefore, had no right to reduce the Plan's expected funding by the amount of Pennington's and Donnell's personal obligations.

The district court was bound to ensure that Pennington and Donnell complied with the restitution arrangement embodied in the consent order. Confronted by clear and convincing evidence of noncompliance by Pennington and Donnell, the district court nevertheless refused to exercise its contempt powers. Rather, it permitted

Pennington and Donnell to bootstrap their personal obligations onto an unrelated transfer of funds. The district court clearly erred in failing to enforce the consent order through the imposition of the civil contempt sanction. Therefore, the district court abused its discretion by denying the Secretary's motion to reconsider or vacate its earlier refusal to hold Pennington and Donnell in civil contempt.

### III.

For the foregoing reasons, we RE-VERSE and REMAND to the district court for the purpose of fashioning an appropriate order.

---

sought to modify the terms of the consent order by asking the district court to credit them with payments made by CSI under the guaranty of contribution. In order for the district court to credit them with the offset, it had to construe the consent order as either absolving CSI of its obligations under the guaranty of contribution

or allowing Pennington and Donnell to take credit for the contributions. The Secretary is correct in arguing that the language of the consent order does not support such a result and that the rights and obligations of CSI and the Bank could not be altered by the consent order.