**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-30835

_____


HAYES WILLIAMS, ET AL

                                        Plaintiffs-Appellees;


                          versus


EDWIN W.   EDWARDS, GOVERNOR,
STATE OF LOUISIANA AND RICHARD
L. STADLER, SECRETARY, LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS,

                                        Defendants-Appellants.



_____

Appeal from the United States District Court
For the Middle District Of Louisiana
_____


June 19, 1996

Before POLITZ, Chief Judge, WIENER, and BARKSDALE, Circuit Judges:

WIENER, Circuit Judge:

     This appeal is the latest chapter in a saga involving

Defendants-Appellants, the Governor of Louisiana and the Secretary

for the Louisiana Department of Public Safety and Corrections (Department), and Plaintiffs-Appellees, four Louisiana prison inmates. This particular chapter begins with the Department's contending that a consent decree governing Louisiana prisons, which was entered by the district court in 1983, terminated automatically in 1989. As a result, the Department concludes, the district court in 1995 lacked jurisdiction to modify that consent decree. For the reasons assigned, we close this chapter by affirming the district court's 1995 modification order in all respects.

I

FACTS AND PROCEDURAL HISTORY

In the beginning (1971), four Louisiana inmates brought this suit against the Department. The inmates sued under § 1983, alleging, inter alia, that the inmate housing conditions at Angola violated the Eighth and Fourteenth Amendments. After a trial on the merits in June 1975 , the district court entered injunctive relief designed to improve the conditions at Angola and decentralize the Louisiana prison system. In February 1977, we affirmed, but remanded the case for a determination of appropriate inmate population limits and security staffing requirements both for Angola and for other state prisons which had been built to decentralize Angola.[1]

This case then moved into its remedial phase. Following the remand, the Department prepared a plan outlining proposed staffing patterns and population limits throughout the state. This

---

[1] Williams v. Edwards, 547 F.2d 1206 (5th Cir. 1977).

document, entitled "Stipulation and Consent Decree," was signed by various state officials and state prison officials, but was not signed by the inmates themselves. In 1983, this document was approved by the district court and entered in the record in the form of an order (1983 Order or Consent Decree).[2] Paragraph 5 of the 1983 Order reads as follows:

> [T]his Stipulation and Consent Decree may be modified as provided hereafter. Additionally, the Court retains jurisdiction to modify the terms and conditions of this Stipulation and Consent Decree upon motion of the parties or upon its own motion.

The 1983 Order also contained a "sunset" clause purporting to terminate the order on one of two specified future dates:

> This Stipulation and Consent Decree shall be in effect as of November 1, 1983, and shall remain in full force and effect for a period of three years from November 1, 1983. If the Court finds an imminent threat of violations of the Eighth Amendment, then this Court shall have the right to extend the duration of this Stipulation and Consent Decree for up to an additional three years.

On November 26, 1986, the district court issued an order extending the 1983 Order because the "current crisis in Louisiana's state and parish jails prevents this court from terminating the Consent Decree at this time."[3] In January 1988, the district court

---

[2] We are forced to use both "1983 Order" and "Consent Decree." Despite a decade of calling the order entered by the district court in 1983 a consent decree, there seems to be some disagreement in this appeal whether that order is in fact a consent decree. Thus, for the sake of clarity and objectivity, we refer to the "1983 Order" in our recitation and throughout the opinion, but are forced periodically (because we quote the district court) to designate it a "Consent Decree."

[3] Neither party contested this extension, even though it was entered 25 days after the first termination date (November 1, 1986) set forth in the "sunset" clause. Presumably, both parties

extended the 1983 Order again, stating that "[w]hile the Court believes the Court's orders remain in effect until actually terminated by the Court, the Court will extend the order for an additional year to avoid confusion and uncertainty."

By 1989, conditions in Louisiana prisons had so deteriorated that the district court declared a "state of emergency" and appointed an expert to assist in resolving these problems. In November 1989, neither the Department nor the inmates moved to enforce the "sunset" clause or otherwise terminate this litigation. To the contrary, from 1989 to 1993 the Department filed innumerable requests for relief (e.g., requests to modify population caps, staffing patterns, program procedures, administrative remedy procedures, and disciplinary rules). Among other orders, on January 28, 1991, the district court certified the case to proceed as a class action.[4]

In 1993, the district court informed the parties that it was convinced that an agreement had been reached by all the parties to extend the 1983 Order beyond 1989. Unable to locate an order extending the 1983 Order beyond the November 1989 date,[5] the court issued another order ('93 Extension Order) which reads in pertinent part:

---

acquiesced in or consented to this initial extension.

[4] At oral argument, Williams asserted that the Department had acquiesced in the certification of the class, and the Department did not dispute this statement.

[5] As this case began in 1971, there are at present 212 volumes of record and over 7,500 documents involved.

> The Consent Decree and other judgments previously entered in this case are hereby extended indefinitely . . . This order is retroactive to November 1, 1989 . . . It is clear that the State of Louisiana and the other parties to this litigation were fully aware of the Court's intent to extend the order because the State of Louisiana was not in full compliance with the Court's original order or subsequent consent decrees.

The '93 Extension Order was not appealed. The Department continued to seek periodic relief in the form of motions for modifications of the 1983 Order.

Between 1992 and 1994, the Department filed eleven motions to "partially terminate" the court's supervision at institutions covered by the 1983 Order. The district court granted nine and denied two.[6] Essentially, each of these nine orders (Modification Orders) modified the 1983 Order by setting a population cap for the institution named in the particular Modification Order and by relieving that institution of the other requirements under the 1983 Order. Each Modification Order ended with the following sentence:

> [A]s long as this civil action remains pending, the Court, the Plaintiffs or Defendants may move to modify or reimpose the previous orders of this Court if conditions at [the institution] violate guaranties afforded inmates under the Eight Amendment of the United States Constitution.

In short, each of the Modification Orders was conditional.

In February 1995 and again in March 1995, the district court

---

[6] The Consent Decree was conditionally modified with respect to the following institutions: Wade Correctional Center, Allen Correctional Center, Work Training Facility/North, Elayn Hunt Correctional Center, Winn Correctional Center, Avoyelles Correctional Center, Dixon Correctional Institute, Louisiana Correctional Institute for Women, and Washington Correctional Institute. Similar motions requesting the partial termination of the consent decree were denied for Phelps Correctional Center and Angola.

issued an order requiring the Department to file a motion identifying (1) each facility that was to be used to house state inmates; (2) the number of beds available in the state prisons; and (3) whether any additional beds could be made available. The court's expert was directed to conduct a similar inventory.

In May 1995, the district court issued the following findings of fact: (1) State prisons were at or near capacity authorized by the Consent Decree; (2) less that 1000 vacancies existed in all local facilities; (3) a crisis existed with respect to housing the Department's inmates; (4) inmates were being released prematurely due to lack of jail space; and (5) there was no plan to construct additional bed space. Before concluding, the district court specifically stated:

> The Court also places all parties on notice of the following, should such action be necessary:
>
> * * * *
>
> (5) it may be necessary to vacate orders which previously removed certain state prisons from the Court's order because of the need to expand the number of prisoners held at those prisons.

In June 1995, the Department submitted a supplemental response which confirmed the district court's preliminary findings of fact. Additionally, the court's expert issued a report which also confirmed the district court's preliminary findings of fact.

In July 1995, the district court and the parties met to discuss these findings, responses, and reports.[7] At the conclusion

---

[7] The Department characterizes this as a status conference. The "conference" was held in court and on the record with the

6

thereof, the district court entered an order ('95 Reinstatement Order) referencing the expert report, the Department's responses, and other evidence concerning the inmate crisis in Louisiana prisons. The '95 Reinstatement Order vacated each of the seven Modification Orders:

> It now appears to the Court that additional hearings are required to determine if additional inmates can be housed in the various state prisons . . . however, in order for the Court to conduct hearings and determine if these state prisons . . . can hold additional inmates, the warden of these prisons which were conditionally released from the Court's order and the prison itself need to be included in the hearing which the Court will hold . . . .

Thus, the district court reinstated the nine released institutions.

In response, the Department then sought a Petition for Mandamus, asking this court to vacate the '95 Reinstatement Order, to which petition the plaintiffs filed an opposition. The district court also filed with this court a formal response to the Department's mandamus petition because of what it labeled "the serious misrepresentations and misleading statements set forth in the [Department's] petition and the glaring omissions of relevant portions of the record . . . ." On July 24, 1995, we denied that petition and the motion for rehearing en banc which followed. The Department timely appealed the '95 Reinstatement Order.

II

DISCUSSION

A.    WHAT ARE WE DEALING WITH?

---

Secretary, all wardens, and other Department personnel present. Both parties were represented by counsel.

7

Initially, we must establish the character of the 1983 Order which, at least until now, has always been referred to and treated as a consent decree. Although we are not sure why, we understand that, at this very late date and for the first time, the inmates are urging that the "sunset" clause is unenforceable because it lacks their signatures. Essentially, this is a contractual argument to the effect that without their signatures the "sunset" clause is unenforceable.[8] We find this newfound identity crisis meritless. The Supreme Court has described a consent decree as "an agreement between the parties to a case after careful negotiation has produced agreement on [its] precise terms."[9] Moreover, we have noted that "[o]nce the district court enters the settlement as a judicial consent decree ending the lawsuit, the settlement takes on the nature of a judgment."[10] Thus, irrespective

---

[8] The inmates have this exactly backwards. What they should be arguing is that the 1983 Order is valid in general, but for some legal or factual reason the "sunset" clause in particular is invalid. Instead, they advance a sweeping contractual argument that because the 1983 Order was not signed by the inmates, the "sunset" clause may not be enforced against them. This argument would fly only if the absence of signatures somehow rendered the 1983 Order invalid in general, and thus, by extension, the "sunset" clause in particular would also be invalid. This cannot be the result the inmates seek.

[9] Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 522 (1986) (internal quotation omitted).

[10] Ho v. Martin Marietta Corp., 845 F.2d 545, 547 (5th Cir.1988); see also 1B James WM. Moore et al., Moore's Federal Practice ¶ 0.409[5], at III-151 (2d ed. 1993) ("The judgment is not, like the settlement agreement out of which it arose, a mere contract inter partes. The court is not properly a recorder of contracts; it is an organ of government constituted to make judicial decisions, and when it has rendered a consent judgment it has made an adjudication." (emphasis added)).

of whether the inmates signed the document, the facts remain that at the time of negotiation the inmates were represented by counsel, the Department of Justice intervened to assist in protecting the inmates' rights, and the district court entered the 1983 Order.

By all indications, the parties intended to settle the case. The document, signed by John T. King, Secretary of the Department of Correction, his attorney, and P. Raymond Lamonica, Executive Counsel for and on behalf of Governor David C. Treen, was labeled "Stipulation and Consent Decree." The courts and the parties (at least until recently) treated the 1983 Order as a consent decree, a final judgment in which the district court retained jurisdiction to issue interim orders necessary for relief and supervision until such time and as the terms are complied with by the Department. We are not persuaded that the parties and the courts have misapprehended the nature of the 1983 Order. Accordingly, we hold that the 1983 Order has had the full force and effect of a judicial resolution of a dispute since it was entered by the district court.

B.    The "Sunset" Clause

We turn now to the issues "if" and "when" the 1983 decree terminated. The Department contends that on November 1, 1989 the "sunset" clause was activated and, as a matter of law, terminated the court's jurisdiction. As a result, the Department concludes, the district court lacked jurisdiction to enter the 1995 Reinstatement Order, breathing life into what it viewed as a deceased decree. We conclude otherwise. The Department may not now assert issues which have long expired.

9

In 1993, the district court stated, on the record, that it was convinced that all the parties had agreed to extend the consent decree beyond any "sunset" provision, but that the court had been unable to locate the order memorializing this extension. To clarify what it found to be either a clerical error or an administrative oversight, the court entered another order, the '93 Extension Order. That order expressly extended the "Consent Decree"--retroactively from November 1, 1989 and indefinitely into the future. Neither party objected; neither party appealed. The matter ends there except for the court's inherent and continuing jurisdiction to enforce its decree -- essential to the court's constitutional function.

C.   Modification of the 1983 Order

The Department nevertheless urges that the district court had no authority to modify the 1983 Order by entering the '95 Reinstatement Order. The Department errs. For the reasons assigned, we affirm the '95 Reinstatement Order.

1.   *The District Court Reserved the Right to Modify*

A consent decree may be judicially modified, over a party's objection, when the court has reserved the power to modify and articulates the long-term objective to be accomplished.[11] The It cannot be gainsaid that the district court expressly reserved the

---

[11] See Walker v. U.S. Dept. Of Housing & Urban Development, 912 F.2d 819 (5th Cir. 1990); See United States v. United Shoe Machinery Corp., 391 U.S. 244, 249-50 (1968) (parties in antitrust consent decree may petition court to exercise the reserved power of modification in order to remain faithful to decree's goal of increased competition); United States v. Swift & Co., 286 U.S. 106, 114 (power of modification may be reserved).

10

power to modify sua sponte both the 1983 Order in general and each of the Modification Orders in particular.

In Rufo v. Inmates of Suffolk County Jail,[12] the Supreme Court explained that modification of a consent decree is governed by the same standards as those governing modifications of judgments, as set forth in Federal Rule of Civil Procedure 60(b).[13] Additionally, when the modification relates to the vindication of a constitutional right, the modification must be "suitably tailored to the changed circumstance."[14] The decision to modify or not to modify a consent decree lies within the discretion of the district court.[15]

Recent developments in Louisiana prisons have once again at least raised the specter of Eighth Amendment violations. In light of these apparent developments, on which we, perforce, express no opinion, the district court exercised its reserved right to revisit

_____

[12] 502 U.S. 367 (1992)

[13] Id. at 379-81. Rule 60(b) provides, in part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgement, order, or proceeding for the following reasons ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it was based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment....

Fed.R.Civ.P. 60(b).

[14] Rufo, 502 U.S. at 383; see also id. at 383 n. 7, 393-95.

[15] Ruiz v. Lynaugh, 811 F.2d 856, 860 (5th Cir. 1987)(per curiam)(citing Neely v. City of Grenada, 799 F.2d 203, 207 (5th Cir. 1986)).

11

the '93 Modification Orders.  Neither the reservation of this right nor the exercise thereof under these circumstances was an abuse of discretion.

   2.   The Court's Inherent Power To Modify

   In addition, it is well settled that consent decrees once entered remain dynamic.[16]   When a court is using a consent decree to supervise a case involving continually changing conditions, the court is deemed to retain the power to modify that decree.[17] Indeed, "there is little question that the district court has wide discretion to interpret and modify a forward-looking consent decree"[18] such as the one at issue here.  As the Supreme Court has noted, "'sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether law or fact, obtaining at the time of its issuance have changed, or new

---

   [16] Id. (citing Systems Federation No. 91 v. Wright, 364 U.S. 642, 650 (1961);  Roberts v. St. Regis Paper Co., 653 F.2d 166, 172 (5th Cir. 1981)).  See also 11A Wright & Miller, Federal Practice and Procedure § 2961 (1995).

   [17] Id. (citing United States v. Swift & Co., 286 U.S. 106, 114 (1932)).

   [18] Alberti v. Klevenhagen, 46 F.3d 1347, 1365 (5th Cir. 1995); see also United States v. City of Miami, 2 F.3d 1497, 1506 (11th Cir. 1993)("[N]otwithstanding the parties silence or inertia, the district court is not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without ever occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest.");  In re Pearson, 990 F.2d 653, 658 (1st Cir. 1993)("[A] court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.").

ones have since arisen.'"[19]  In like manner, the district court has the discretion to modify a decree when the court is made aware that the factual circumstances or the law underlying that decree has changed--regardless of the parties' silence or inertia.[20]

When we advert to the facts of this case, we note that, as a technical matter, the '95 Reinstatement Order is the vacature of a prior modification to the 1983 Order.  Rather than a modification of the 1983 Order--the original agreement reached by the parties and endorsed by the court--the '95 Reinstatement is a return to the terms of the 1983 Order.  As a result, on this appeal we do not address whether the court's changes may have gone beyond the intent of the parties.  Rather, the legal posture presented to us is a return by the district court to the constraints originally established by the parties and the court, a return motivated by the apparent re-emergence of potentially unconstitutional conditions in Louisiana prisons.  The court did not err in doing so.

This case was brought initially to protest and remedy unconstitutional housing conditions in Louisiana prisons.  In 1995, the district court found that conditions in Louisiana prisons appeared to have returned to a constitutionally precarious state. It did so after considering evidence from the parties and from the

---

[19] Rufo, 502 U.S. at 380 (quoting System Fed'n No. 91, Railway Employees' Dep't v. Wright, 364 U.S. 642, 647-48 (1961)).  The Court also noted that "[t]he experience of the district and circuit courts in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation."  Rufo, 502 U.S. at 380.

[20] Alberti, 46 F.3d at 1365-66.

court appointed expert. Concerned about a potential crisis in the Louisiana prison system, the district court had instructed the parties and the court's expert to investigate. When the responses of the parties and the report of the expert reflected support for the concerns of the court, it vacated the Modification Orders so that a more detailed examination of the status of Louisiana prisons could be accomplished. We conclude that the district court had the authority to enter the '95 Reinstatement Order; and that, in doing so, it did not err or abuse its discretion. For this reason also, we affirm the '95 Reinstatement Order.

C.   The Due Process Issue

Finally, the Department complains that the '95 Reinstatement Order should be reversed because the Department was denied due process. Specifically, the Department argues that the district court (1) did nothing to suggest that it might vacate the Modification Orders and (2) denied the Department an opportunity to be heard on this issue. The record does not support these contentions. In May 1995, the district court informed the Department that the court was concerned about the bed space situation in Louisiana prisons, and that the court was considering vacating the '93 Modification orders and conducting a full investigation. The Department was put on notice. In addition, both the Department and the court's own expert submitted reports and responses on the relevant bed space conditions. After discussing this evidence with the parties the district court entered the '95 Reinstatement Order. That the Department had an

14

opportunity to be heard cannot be questioned, and its due process

rights were not violated.

D.    PRISON LITIGATION REFORM ACT OF 1995

On April 26, 1996, three days before we heard arguments in

this case, the Prison Litigation Reform Act of 1995 (Act) became

law.  As a result, we requested the parties to submit additional

briefing on the applicability of the Act to the instant appeal.

After reviewing the Act and the briefs of the parties, we conclude

that the Act does not affect the outcome of this appeal.

Essentially, the Act codifies the standards governing a

district court's grant of prospective relief in prison reform

litigation.  In pertinent part, the Act reads as follows:

> The court shall not grant or approve any prospective
> relief unless the court finds that such relief is
> narrowly drawn, extends no further than necessary to
> correct the violation of the Federal right, and is the
> least intrusive means necessary to correct the violation
> of the Federal right.[21]

In other words, when a district court fashions prospective relief

in prison litigation, the relief must meet the standards set forth

in the Act.  In this case, however, the district court has yet to

fashion any prospective relief.  Instead, we understand the 1995

Order to have brought the nine previously released institutions

back within the court's continuing jurisdiction so that it may

examine whether prospective relief is necessary to avoid

constitutional violations from occurring in those institutions.

---

[21] 18 U.S.C. § 3626(a)(1).  The limitations codified in the Act
do not depart from pre-existing law of this circuit.  See, e.g.,
Alberti v. Klevenhagen, 790 F.2d 1220, 1227 (5th Cir. 1986); Ruiz
v. Estelle, 679 F.2d 115 (5th Cir. 1982).

15

The district court has fashioned no prospective relief and the provisions of the Act have yet to be triggered in this case. In the future, however, if the district court should undertake this examination and if it should find a violation of a "Federal right," then any remedy it might fashion must conform to the standards set forth in the Act. But for now, the Act does not affect this case.

For the foregoing reasons, the '95 Reinstatement Order is, in all respects, affirmed, and the matter is returned to the district court for further proceedings consistent herewith.

16