Alejandro **MADRID, et al.,** on behalf of themselves and all others similarly situated, Plaintiffs,

v.

James **GOMEZ, Director, California Department of Corrections, et al., Defendants.**

No. C90–3094–TEH.

United States District Court, N.D. California.

Aug. 23, 1996.

---

Steven Fama, California State Prison at San Quentin, San Quentin, CA, Alejandro Madrid, Pelican Bay State Prison, Crescent City, CA, Susan Creighton, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Michael W. Bien, Rosen Bien & Asaro, San Francisco, CA, Donald Specter, Prison Law Office, San Quentin, CA, for Plaintiffs.

Peter J. Siggins, William Jenkins, California State Attorney General's Office, San Francisco, CA, Richard H. Caulfield, Michael M. McKone, Caulfield, Davies & Donahue, Sacramento, CA, for Defendants.

Thomas F. Lonergan, Downey, CA, Special Master.

## ORDER

**THELTON E. HENDERSON,** Chief Judge.

This matter comes before the Court on the issue whether section 802(a)(f)(4) of the recently enacted Prison Litigation Reform Act ("PLRA"), Pub.L. 104–134, 110 Stat. 1321 (amending 18 U.S.C. § 3626), applies retrospectively to this case.[1] After carefully considering the parties' initial and supplemental briefs, their oral arguments, and the record herein, we conclude that it does not for the reasons set forth below.

### DISCUSSION

The PLRA imposes a number of new restrictions on actions seeking to redress unconstitutional conditions in prisons. The section presently before the Court, section 802(a)(f)(4), 18 U.S.C. § 3626(f)(4), provides that:

> The compensation to be allowed to a special master under this section shall be based on an hourly rate not greater than the hourly rate established under section 3006A for payment of court-appointed counsel, plus costs reasonably incurred by the special master. Such compensation

---

1. The Court originally asked the parties to file expedited letter briefs on the following two issues: "(a) the impact of that portion of Section 802[a](f)(4) of the Act which provides that 'Such compensation and costs [of Special Masters] shall be paid with funds appropriated to the Judiciary,' on experts and staff of the Special Master, and, (b) if such provision governs the compensation of experts and staff, whether such provision is enforceable in the event federal funds are not made available."

The Court initially framed the questions in this way because it appeared at the time that there was a potential imminent emergency concerning the Special Master's experts and staff that would be extremely disruptive to the active and ongoing remedial process. However, as the parties indicated, resolution of the above issues turns on the broader issue of the applicability of section 802(a)(f)(4) generally. Accordingly, the Court broadened its inquiry, and when the immediate emergency dissipated, ordered the parties to file supplemental briefs.

and costs shall be paid with funds appropriated to the Judiciary. *Id.*[2] Defendants contend that this section applies retrospectively to this case. If so, this Court must modify that portion of its January 23, 1995 Order of Reference which (1) set the Special Master's compensation at $125 per hour[3] and (2) required defendants to bear the expense of the Special Mastership. January 23, 1995 Order at 6–7. Plaintiffs, on the other hand, argue that section 802(a)(f)(4) is not applicable to the case at bar.

■ To resolve this dispute we turn to the Supreme Court's decision in *Landgraf v. USI Film Products, Inc.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), which "signalled a significant shift in the manner in which federal courts should analyze questions involving the application of new civil statutes to conduct that has already occurred." *U.S. ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1407 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1319, 134 L.Ed.2d 472 (1996). Under *Landgraf*, courts must first determine "whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1505. If so, that ends the matter and we follow the Congressional command (assuming such command does not itself violate the Constitution). *Id.* at —— – ——, 114 S.Ct. at 1497–98, 1505.

■ Where, however, no such express direction is provided, judicial default rules apply. Under these rules we first analyze whether application of the statute would operate "retroactively" by attaching new legal consequences to events completed before its enactment. *Id.* at ——, 114 S.Ct. at 1499;

*Lindenthal*, 61 F.3d at 1407. If the statute would have such effect, then a presumption exists against retrospective application. *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1505. This "deeply rooted" presumption "embodies a legal doctrine centuries older than our Republic," *id.* at ——, 114 S.Ct. at 1497, and can only be overcome by clear evidence of a contrary legislative intent. *Id.* at ——, 114 S.Ct. at 1498, 1505. As the Supreme Court explained, such intent ensures "that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at ——, 114 S.Ct. at 1498; *see also id.* at ——, 114 S.Ct. at 1501. In short, once judicial default rules apply, "*Landgraf* teaches that courts should not apply 'retroactive' statutes 'retrospectively' absent clear congressional intent." *Lindenthal*, 61 F.3d at 1407.[4]

■ In this case, Congress has expressly prescribed the retrospective reach of section 802 of the PLRA, 18 U.S.C. § 3626. In a separate section at the conclusion of the statute, section 802(b), titled "Application of Amendment," Congress states as follows:

(1) IN GENERAL—Section 3626 of title 18, United States Code, as amended by this section [i.e. the Prison Litigation Reform Act] shall apply *with respect to all prospective relief* whether such relief was originally granted or approved before, on, or after the date of the enactment of this title (emphasis added).

Thus, Congress explicitly directed that the PLRA applies retrospectively, but only with respect to "all prospective relief" that had been previously granted.[5] Accordingly, we

---

**2.** The hourly rate established under section 3006A for payment of court-appointed counsel is $75.00.

**3.** The Court set this hourly rate based on its determination that it was both reasonable and consistent with the compensation that Special Master Thomas Lonergan had earned for similar work. *See* January 23, 1995 Order at 6.

**4.** Although the Supreme Court and other courts have sometimes used the terms "retroactive" and "retrospective" interchangeably, *see e.g., Landgraf*, 511 U.S. at —— – —— & n. 23, 114 S.Ct. at

1498–99 & n. 23, the Ninth Circuit has "clarified the terminology *Landgraf* employs by using the term 'retrospective' to describe [any] application of a new statute to events that occurred before its enactment, and reserving the term 'retroactive' to describe a statute that, if applied, would attach new legal consequences to conduct or transactions already completed." *Lindenthal*, 61 F.3d at 1407.

**5.** Had Congress intended to make the *entire* PLRA retrospective, it could have simply said that the PLRA "shall apply with respect to all *orders and proceedings* in pending cases (or perhaps all orders and proceedings save specified

must determine whether that portion of the Court's January 23, 1995 order setting the Special Master's hourly rate and finding defendants responsible for the expense of the Special Mastership constitutes an order granting "prospective relief."

We begin with the definitional section of the PLRA, section 802(g) which provides definitions for the terms "prospective relief" and "relief." As noted in *Coleman v. Wilson*, 933 F.Supp. 954 (E.D.Cal.1996) (1996 WL 405817), however, the PLRA's definitions of those terms are essentially circular and thus fail to resolve the issue before the Court. Specifically, the Act defines the phrase "prospective relief" to mean all "relief" other than compensatory monetary damages, and then defines "relief" to mean "all relief ..." *See* 18 U.S.C. § 3626(g)(7) ("prospective relief" means "all relief other then compensatory monetary damages"); *Id.* at § 3626(g)(9) ("relief" means "all relief in any form that may be granted or approved by the Court ..."); *see also Coleman*, 933 F.Supp. 954 (statutory definition of relief "sheds no light on the disputed term's meaning since 'relief' is in essence defined as all relief"). Nor does the legislative history supply any useful clarification of the term "relief."

The Court is not, however, left without other sources of guidance. Given that the term "relief" in section 802(b) is used in the context of relief that "is granted or approved" by a court, we agree with *Coleman* that it is appropriate to construe the term in light of its traditional legal meaning. That meaning focuses on the actual change in legal relations or in defendants' conduct or actions that cures the legal wrong and makes the plaintiff whole. *See e.g.* Black's Law Dictionary (6th Ed.1991) (defining relief as "[d]eliverance from oppression, wrong, or injustice.

In this sense it is used as a general designation of the assistance, redress, or benefit which a complainant seeks at the hands of a court, particularly in equity. It may be thus used of such remedies as specific performance, injunction, or the reformation or recision of a contract").

Thus, while the "relief" might be reformation or recision in a contract case, reinstatement in an employment case, or a plan for desegregation in a school discrimination case, the "relief" in the instant case consists of such things as defendants' new policies regarding the use of force, expansion of the medical and mental health staff, and deployment of a screening mechanism to prevent the placement of seriously mentally ill inmates in the Security Housing Unit. All of these actions provide plaintiffs with "relief" from the constitutional deprivations proven at trial.

■ The two rulings affected by section 802(a)(f)(4)—specifying the Special Master's hourly rate and requiring defendants to bear this expense—stand in stark contrast to this traditional legal notion of relief. Indeed, these rulings do not provide any member of the plaintiff class with relief from any unconstitutional condition at Pelican Bay State Prison. Rather, they govern aspects of the Special Mastership which, while important, simply do not constitute "relief" as that term is traditionally understood in a legal context. Even the appointment of a Special Master itself (much less orders specifying an hourly rate and method of payment), does not appear to constitute "relief." This is because a Special Master is simply a device utilized by the Court to assist in the formulation of appropriate relief or to monitor relief that is ordered. The appointment, however, is not itself relief.[6]

exceptions), whether such order or proceeding occurred before, on, or after the date of the PLRA." By limiting the retrospective reach of the PLRA to those orders which grant or approve "prospective relief," Congress made it clear that the retrospective reach of the PLRA is more limited in scope.

**6.** Indeed, if the court appointed a Special Master but the defendants never actually changed the policies or practices that had been found unconstitutional, the court could not be said to have

provided the plaintiff class with any "relief" from the constitutional deprivations proven at trial.

Notably, the Fifth Circuit Court of Appeals recently presumed, without expressly deciding, that a lower court's order appointing an "expert" (who appears to have functioned as a Special Master), did not constitute "prospective relief" for purposes of the PLRA. *See Williams v. Edwards*, 87 F.3d 126 (5th Cir.1996). There, the trial court had approved a consent decree after a trial on the merits. In describing the procedural history of the action, the court of appeals dis-

The structure of the PLRA adds further support to the conclusion that the Court's prior determinations regarding the hourly rate and the source of payment of the Special Master do not constitute "relief." Except for the separate "Application of Amendment" provision, discussed above, section 802 of the PLRA is contained in one section, 18 U.S.C. § 3626, which is divided into seven subsections, several of which specifically address either prospective relief or relief. Thus, subsection (a) is entitled "Requirements for Relief," subsection (b) is entitled "Termination of Relief", subsection (c) is entitled "Settlements" and subsection (e) is entitled "Procedure for Motions Affective Prospective Relief." The provisions dealing with special masters, however, are contained in a separate section, subsection (f), entitled "Special Masters." Moreover, the language of subsection (f) further distinguishes Special Masters from the relief itself. For example, subsection (f)(6)(C) permits Special Masters, upon authorization by the court, to assist in the development *of the remedy,* and subsection (f)(6)(D) provides that the Special Master shall be relieved of his or her appointment once *the relief* is terminated.

Defendants assert that by making the PLRA retrospective "with respect to all prospective relief," Congress "clearly envision[ed] that *every* provision of [the PLRA] . . . [was] intended to apply [retrospectively] to pending cases." Defendants' June 18, 1996 memorandum at 8 (emphasis in original). However, as explained above, the plain language of section 802(b), the traditional legal meaning of the term "relief," and the structure of the PLRA do not make this clear at all; instead they argue to the contrary.

Defendants nonetheless contend that use of the phrase "with respect to prospective relief" was not intended to distinguish among different types of orders; rather, it was only intended to "distinguish open cases with prospective effects from cases in which judgments are irrevocably final." *Id.* This distinction is not entirely clear as even in cases in which there is a final judgment there could be orders which have prospective effects. In any event, section 802(b) simply does not make the distinction defendants urge upon the Court. Indeed, their approach would essentially require us to re-write section 802(b) to extend retrospective application of the PLRA to any order having a prospective "effect" rather than limiting it to those which provide prospective "relief." This we are not at liberty to do.[7]

Given all of the above, it is clear that the operative term—relief—does not encompass a prior order of the Court setting the hourly rate of a Special Master or the source of the payment. Moreover, even assuming *arguendo* that the term "relief" was found to be ambiguous in this regard, we would, for the reasons explained below, resolve that ambiguity against retrospective application in this particular case.

■ When Congress expressly dictates the retrospective reach of a statute but expresses this command using a term later found susceptible of more than one interpretation, we should avoid unnecessarily broad constructions that result in retroactive effects that Congress has not clearly considered. This approach is consistent with the judicial default rules fashioned by the Supreme Court in *Landgraf* to resolve retrospectivity disputes where Congress has not clearly spoken on the question. *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1505. As

cussed how the trial court's "expert" had investigated and reported to the court on housing conditions and bed space problems in the Louisiana prisons. The appellate court then held that the section of the PLRA which governs the standards for granting prospective relief had not yet been triggered because "the district court has yet to fashion any prospective relief." *Id.* at 133. Implicit in this ruling was the Court's assumption that the trial court's previous appointment of the "expert" did not constitute an order granting prospective relief.

7. Defendants make a similar assertion that "[b]ecause Congress plainly intended all the prospective provisions of 3626 to apply to pending cases the Court's inquiry should end right here." Defs' June 18, 1996 Memorandum at 8. This assertion, however, glosses over the actual language used by Congress. Congress did not, as defendants suggest, extend the retrospective reach of Section 802(b) to all prospective *provisions;* rather it gave the PLRA a more modest backward stretch—to all prospective *relief.*

discussed above, those rules impose a clear presumption against applying legislation retrospectively that would have a retroactive effect. *Id.* at ——, ——, ——, 114 S.Ct. at 1501, 1505, 1508 (Given public and legislative expectations, statutes with retroactive effect should not apply retrospectively absent evidence that Congress clearly favored this result).

Thus, to extent that the term "relief" is subject to more than one possible construction, it is appropriate to adopt that interpretation which avoids retroactive effects. This Court's reading of the term "relief," discussed above, clearly avoids any such effect since it precludes retrospective application of section 802(a)(f)(4). In contrast, defendants' broader interpretation would require application of section 802(a)(f)(4) to this case. More importantly, we conclude that section 802(a)(f)(4), if applied, would operate retroactively in this particular case.

As *Landgraf* makes clear, retroactivity may manifest itself in different ways depending on the context. Thus, the inquiry into whether a statute would operative retroactively in any given case can not always be solved by resort to simple formula or rigid rules. As the Supreme Court noted, "deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1498. Rather, courts assessing retroactivity "must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at ——, 114 S.Ct. at 1499. "The conclusion," the Court added, "that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* As the Court acknowledged, "[a]ny test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." *Id.* The Court concluded, however, that:

> retroactivity is a matter on which judges tend to have 'sound ... instinct[s]' ... and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.*

To be sure, the Supreme Court highlighted three common retroactive effects that may result from new legislation: (a) the impairment of rights a party possessed when s/he acted, (b) an increase in a party's liability for past conduct, or (c) the imposition of new duties with respect to transactions already completed. *Id.* at ——, 114 S.Ct. at 1505. We do not, however, read the Supreme Court to hold, as defendants suggest, that these three examples represent the entire universe of possible retroactive effects. Indeed, such a reading would conflict with the Court's more expansive explanation of retroactivity discussed above, *id.* at ——, 114 S.Ct. at 1499, and would render all but meaningless the Court's admonition that the retroactivity judgment comes "at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.; see also Lindenthal,* 61 F.3d at 1407 (noting the three examples cited above but defining the term "retroactive" to mean a new statute which, if applied retrospectively, "would attach new legal consequences to conduct or transactions already completed").[8]

Thus, in deciding whether the term "relief," if construed broadly, would cause retroactive effects in this case (through the retrospective application of section 802(a)(f)(4)), we focus on the basic inquiry underlying the three examples identified above: whether the

---

8. Indeed, it is likely that the three examples provided by the Court simply reflect the fact that the retroactivity dispute in *Landgraf* focused on the effect of new legislation on the parties. *See id.* at ————, 114 S.Ct. at 1505–08. The Court nowhere states, however, that retroactivity is limited to a direct effect on a party. Rather, as the Court earlier stated, "[e]lementary considerations of fairness dictate that *individuals* should have an opportunity to know what the law is and to conform their conduct accordingly." *Id.* at ——, 114 S.Ct. at 1497 (emphasis added); *see also id.* at ——, 114 S.Ct. at 1500 (discussing "unfairness of imposing new burdens on *persons* after the fact") (emphasis added); *Chappell v. Gomez,* C93–4421 FMS (N.D.Cal. August 8, 1996) (finding retroactive effect of new legislation upon non-party attorney).

statute in question (in this case section 802(a)(f)(4)) "attaches new legal consequences to [prior] events," *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1499, or results in unfair new burdens. *Id.* at ——, 114 S.Ct. at 1500 ("The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact").[9]

While the retroactive effects of section 802(a)(f)(4) in the case at bar may not be traditional (given the unusual nature of the provision), they are no less real. The Court appointed the Special Master to undertake a tremendously demanding task in a very complex case involving numerous, and sometimes novel, remedial issues. Indeed, this Court's experience with the remedial process to date has only served to further demonstrate the difficulty and extent of the challenges facing the Special Master in this case. The Special Master accepted this assignment in January 1995 on the representation that he would be compensated at an hourly rate of $125.00 per hour. As of the date of this order, he has devoted close to 18 months to assisting defendants to formulate and implement relief for the plaintiff class. It is also clear to the Court that it could not ask for a more experienced, diligent, and conscientious Special Master.

The gross unfairness of depriving the Special Master—ex post facto—of the benefit of the Court's representation and order, and slashing his compensation 40 percent many months into the remedial process is self-evident. The drastic change in pay also plainly changes the legal consequences of the Special Master's acceptance of, and appointment to, his position long after the fact, and long after he has committed himself morally and professionally to completing the task undertaken. Under these circumstances, we

have little doubt that section 802(a)(f)(4) is genuinely retroactive in any fair sense of the word. As such, "sound considerations of general policy and practice". . . . and "long held and widely shared expectations about the usual operation of legislation," *id.* at 1508, strongly argue against the retrospective application of section 802(a)(f)(4) in this particular instance.[10]

Shifting the cost of the Special Mastership from defendants to the judiciary is also retroactive in nature. This unprecedented aspect of section 802(a)(f)(4) relieves a culpable litigant of a significant financial burden required to cure its own constitutional violations, and instead imposes that obligation upon the federal courts. As such, the provision fundamentally alters the legal consequences—for the judiciary—of this Court's prior finding of liability, for the Court has little choice but to continue the Special Mastership. Any other action would constitute an abdication of this Court's responsibility to ensure that defendants formulate and implement full relief for the plaintiff class.

Defendants emphasize that they are "not aware of any case finding such judicial interests cognizable for purposes of determining a statute's retroactivity." Defs' Memorandum at 9. We do not find this observation dispositive, however, since this appears to be the first time that Congress has imposed what is normally considered a responsibility of the losing party upon the judiciary—and the first time such a party has sought retrospective application of such a provision.

The transfer of the cost of the Special Mastership at this juncture not only imposes a substantial new burden on the judiciary for its previous decisions, but it also injects uncertainty into an on-going remedial process and alters its existing balance. While the Court has been informed that some federal

---

**9.** We note that legislation affecting relief that is "prospective" is not generally considered to have genuinely retroactive effects. *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1501 (citing *American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921)). The question, here, however, is not whether the orders at issue are "prospective" but whether they constitute "relief."

**10.** We further note that while the Court did not enter into a formal contract with the Special

Master, the Special Master's agreement to undertake the appointment and to do so at a specific hourly rate is contractual in nature. As the Supreme Court observed in *Landgraf,* courts have been particularly reluctant to permit new legislation to disturb contractual rights. *See Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1500 (noting that application of presumption against retrospectivity is most commonly found in cases which "affect[ ] contractual or property rights, matters in which predictability and stability are of prime importance").

funds are currently available, there is clearly no guarantee that those funds will continue to be forthcoming or will not be subject to restrictions that may significantly impair the Court's ability to effectuate full and effective relief. Of course any such impairment would also interfere with the plaintiffs' rights to such relief. Completely relieving defendants of any obligation to bear the cost of the Special Mastership may also undermine incentives to proceed efficiently and may even provide contrary incentives to delay.

▪ Given the above, we are persuaded that applying section 802(a)(f)(4) to this case in the midst of the remedial process would result in genuine retroactive effects. Thus, to the extent that the term "relief" is ambiguous, we conclude that our original interpretation should still prevail. To hold otherwise and adopt defendants' interpretation would permit section 802(a)(f)(4) to operate retroactively in this case without any evidence of Congressional intent favoring such a result.[11] Such an outcome clearly runs afoul of the "long held and widely shared expectations about the usual operation of legislation" that underlay the presumption against retroactive legislation. *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1508.[12]

## CONCLUSION

In sum, Congress has expressly limited the retrospective reach of the PLRA to orders providing prospective "relief." For all of the reasons set forth above, we conclude that this Court's January 23, 1995 order setting the hourly rate of the Special Master and determining the party responsible for payment does not constitute "relief" for purposes of section 802(b) of the PLRA. Accordingly, section 802(a)(f)(4) of the PLRA, 18 U.S.C. § 3626(f)(4), does not apply retrospectively to this action.[13] Therefore, and good cause appearing, defendants' request to modify the Court's January 23, 1995 Order of Reference to conform to section 802(a)(f)(4) must be denied.

IT IS SO ORDERED.

---

11. As defendants concede, "the legislative history provides no clear answer [as to the retrospective application of the master's fees provisions]." *Defs' June 18, 1996 Memorandum at 8.* Indeed, the type of retroactive effects discussed above may have dissuaded Congress from expressing any clear intent on the issue. It is also worth noting that although Congress was well aware of an Arizona statute that prohibited payment to already-appointed special masters, *see* 141 Cong. Rec. S14408–01, S 14418 (Sep. 27, 1995) (Statement of Senator Kyl), Congress did not follow the Arizona format. *Compare* section 802(a)(f)(4) of the PLRA *with* Arizona Rev.Stat.Ann. §§ 35–152(A), (C), and (E) (subsequently invalidated on supremacy grounds in *Hook v. Arizona,* 907 F.Supp. 1326, 1338 (D.Ariz.1995)).

12. It is also well settled that where a particular interpretation of a statute would raise serious constitutional issues, the court "must independently inquire whether there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed to [the statute in question]." *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Construction,* 485 U.S. 568, 577, 108 S.Ct. 1392, 1399, 99 L.Ed.2d 645 (1988); *see also Landgraf,* 511 U.S. at ——, n. 21, 114 S.Ct. at 1498, n. 21 ("In some cases, however, the interest in avoiding the adjudication of constitutional questions will counsel against a retroactive application"). Here, plaintiffs contend that construing the PLRA to make section 802(a)(f)(4) applicable to this case would raise serious constitutional questions regarding separation of powers and equal protection. Thus, plaintiffs argue, the rule enunciated in *DeBartolo supra* provides an additional basis for rejecting retrospective application of section 802(a)(f)(4). We need not reach this issue, however, given our resolution of the instant dispute on other grounds.

13. Given that Congress provided an express command regarding the retrospective reach of the PLRA, it is not necessary to resort to the judicial default rules described earlier in this order. *See also Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1505. However, even assuming *arguendo* that Congress failed to provide an express command, and we were to resort to judicial default rules, the end result would not differ. For the same reasons discussed above, we would conclude that application of section 802(a)(f)(4) to this case would result in genuine retroactive effects. As such, the presumption against retrospective application applies absent clear congressional intent favoring such a result. *Id.* at ——, 114 S.Ct. at 1505. Since, as defendants concede, there is no such evidence of "clear congressional intent," *see* Defs' June 18, 1995 memorandum at 8, with respect to section 802(a)(f)(4), the presumption applies and the provision may only be given prospective effect. *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1505.